FILED

2014 MAR 18 PM 1:00

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

**MARKS & KLEIN, LLP**
Gerald A. Marks, Esq. (*Pro Hac Vice* Forthcoming)
Evan M. Goldman, Esq. (*Pro Hac Vice* Forthcoming)
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625
jerry@markskleln.com
evan@marksklein.com

**SCHINDLER LAW GROUP**
Eric Schindler, Esq. (State Bar No. 141386)
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Telephone: (949) 483-8700
Facsimile: (949) 464-9714
eric@schindlerlaw.net

Attorneys for Plaintiff
DILIP PATEL, SAROJ PATEL AND
SAROJ PATEL, INC.

**UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION**

| | |
|---|---|
| DILIP PATEL, SAROJ PATEL and SAROJ PATEL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>7-ELEVEN, INC., a wholly-owned subsidiary of SEVEN-ELEVEN JAPAN CO., LTD, a wholly-owned subsidiary of SEVEN AND I HOLDINGS CO., LTD.,<br><br>Defendant. | **Case No.** EDCV14-00519 PSG (DTBx)<br><br>**VERIFIED COMPLAINT FOR VIOLATION OF THE FRANCHISE RELATIONS ACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUDULENT INDUCEMENT, FALSE IMPRISONMENT, AND DECLARATORY RELIEF**<br><br>**<u>DEMAND FOR JURY TRIAL</u>**<br><br>BY FAX |

COME NOW the Plaintiffs, DILIP PATEL, SAROJ PATEL and SAROJ PATEL, INC. (collectively, "Plaintiffs") and for their Complaint against the Defendants states as follows:

**INTRODUCTION**

1. This is an action for violation of the California Business and Professional Code §§ 20020, 20021 and 20030 and violation of the covenant of good faith and fair dealing based upon Defendant's improper termination of Plaintiffs' franchise agreement.

2. Defendant 7-Eleven, Inc. ("7-Eleven"), once a domestic icon, is now wholly owned and controlled by a Japanese Corporation and is the largest convenience store chain in the world, with more than 31,000 locations worldwide. Defendant's stores are extended-hour retail stores that provide a wide variety of products to its customers, including groceries, beverages, dairy products, lottery tickets, money orders, and other non-food merchandise.

3. For almost nineteen years, Plaintiffs Dilip ("Dilip") and Saroj ("Saroj") Patel (collectively, the "Patels"), a husband and wife, operated a 7-Eleven franchised store in good faith (hereinafter, the "Patel Store").

4. Dilip and Saroj have been the face of 7-Eleven in the Riverside, California community and have been recognized for their promotion of school scholarships.

5. Over their nearly two decades as 7-Eleven franchisees, the Patels have given away free merchandise (e.g. Slurpees) to neighborhood elementary school children who either achieve high grades or meet various school work assignments or goals – which is encouraged by 7-Eleven. Attached hereto and incorporated herein as Exhibit A is a true and correct copy of an Elementary School Children Appreciation banner; Attached hereto and incorporated herein as Exhibit B is a true and correct copy of various Community Support Letters, from Parents, Customers and School Officials; Attached hereto and incorporated herein as Exhibit C is a true and correct copy of various 7-Eleven Press Releases.

6. On December 5, 2013, using deception and improper interrogation techniques, 7-Eleven coerced Plaintiff Dilip Patel, individually and as an officer of Plaintiff Saroj Patel, Inc. (**but not Plaintiff Saroj Patel**) to relinquish his and Saroj Patel, Inc.'s interests in the Patel Store.

7. This resulted in the Patels losing over $440,000 in equity that they could have obtained, had they sold the store to a willing third-party purchaser.

8. 7-Eleven used coercive and "storm trooper" interrogation and isolation tactics to illegally coerce Plaintiffs to purportedly agree to terminate their Store Franchise Agreement.

9. Upon information and belief, the tactics used are part of a wider, nationwide 7-Eleven scheme to improperly intimidate and terminate long-term franchisees, with the goal of acquiring their successful stores.

10. Upon information and belief, 7-Eleven's intimidation and termination efforts are primarily focused on the states of New York, New Jersey and California.

11. 7-Eleven improperly terminates the franchisee(s) (such as the Patels) and takes away their stores on fictitious grounds of wrongdoing.

12. To achieve this goal, 7-Eleven uses coercive and unlawful interrogation techniques, and does so without paying long-term franchisees ***any*** consideration.

13. The sole purpose of acquiring these stores – albeit through illegal means – is to "take back" the stores, at no cost, with the intent to ultimately re-sell the store, for a fee, to a third-party purchaser.

14. 7-Eleven hired more Asset Protection employees than any other company in 2013. Attached hereto and incorporated herein as Exhibit D is a true and correct copy of a News Brief from D&D Daily.

15. Upon further information and belief, 7-Eleven hired approximately thirty-five Asset Protection employees.

16.     7-Eleven is using its Asset Protection/Loss Prevention ("AP/LP") Department as a profit center to realize a significant return on its investment in hiring large numbers of Asset Protection employees.

17.     The pressure to provide a return on the AP/LP Department investment is tremendous.

18.     Upon information and belief, 7-Eleven has instituted quotas to the AP/LP Department, which in turn, causes the AP/LP employees to bring dubious and fabricated charges against franchisees – such as the Patels.

19.     The false charges lodged against the Patels are a direct and proximate result of 7-Eleven's attempt to get a return on its investment in hiring various AP/LP Department employees.

20.     Converse to 7-Eleven, most major retailers use their asset protection departments in a "non-productive" manner, trying to limit losses from theft and shrinkage.

21.     More specifically, 7-Eleven uses its AP/LP Department as a "**productive work center**" by taking back franchises at no cost – only to resell them for a large fee.

22.     7-Eleven's efforts to terminate franchises and "take back" stores have been tremendously profitable for 7-Eleven.

23.     Upon further information and belief, the amount received by 7-Eleven in reselling taken-back stores is in excess of ten million dollars.

24.     The number of stores taken back in New York, New Jersey and California is higher than other regions, as a percentage of stores, because of the relatively high resale value 7-Eleven can obtain after unlawfully re-selling stores in those states.

25.     7-Eleven targets franchisees in New York, New Jersey and California with faux investigations while simultaneously avoiding serious fraudulent activity committed by franchisees in other, less profitable states.

26. The Patel Store, Store No. 2171-27635, was located in Riverside, California – one of the areas targeted by 7-Eleven's AP/LP Department.

27. When 7- Mark Stinde ("Stinde"), Vice President of Asset Protection for 7-Eleven, was given permission by 7-Eleven to hire thirty-five AP/LP Department employees, the positions were not posted publically.

28. The purported reason for the secretive hirings was to provide 7-Eleven with a secretive opportunity to investigate franchisees, and preserve the "element of surprise" when an increased quantity of stores began being taken back.

29. When Stinde hired the new AP/LP Department employees, the vast majority of them were given assignments in two newly-created divisions: (i) the Centralized Investigations Team ("CIT"); and (ii) the Profit Assurance Team, a covert mobile surveillance team.

30. Further contrary to most other major retailers, 7-Eleven does not have any known AP/LP Department directives and/or operating standards.

31. As a result of having no known standards, and with the arbitrary quotas given to the AP/LP Department employees, 7-Eleven employees are given leeway to – and do take – improper actions as described in detail herein.

**JURISDICTION AND VENUE**

32. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity).

33. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b).

34. The amount in controversy on each of these counts set forth below exceeds the sum of $75,000 exclusive of interest and costs.

**THE PARTIES**

35.     Plaintiff Dilip Patel is citizen of the State of California and resides in Corona, California.

36.     Plaintiff Saroj Patel is citizen of the State of California and resides in Corona, California.

37.     Plaintiff  Saroj Patel, Inc. is a California corporation whose shares are owned equally by  owned by Dilip Patel and Saroj Patel.

38.     7-Eleven is a Texas corporation. It maintains a place of business at 1722 Routh Street, Suite 1000, Dallas, Texas 75201.

**BACKGROUND**

39.     For nearly nineteen years, Plaintiffs, in good faith, have operated a 7-Eleven franchised store in Riverside, California.

**7-Eleven's Unlawful and Illegal Interrogation Tactics**

40.     On December 4, 2013, Plaintiffs received a phone call that 7-Eleven wanted to meet with them to go "over some financials" and a meeting was scheduled for 10:00 a.m. the following day at 7-Eleven's offices.

41.     On the morning of the meeting, Plaintiffs Dilip and Saroj, and their twenty-seven year old son, Dev, who was a manager at the store, were met by 7-Eleven's market manager for Market 2171, William Halverson.

42.     Dilip and Saroj were then taken to a small room where they were surprised to meet 7-Eleven Asset Protection interrogators, Kevin New ("New") and Steve Kellison ("Kellison") (collectively, the "Asset Protection Interrogators"), who immediately accused of them of fraud and wrongdoing with respect to couponing.

43. Specifically, the Asset Protection Interrogators told Plaintiffs that the fraud being perpetrated in the store involved the excessive use of Slurpee coupons and that Plaintiffs' franchise, which they had for eighteen years, was being terminated and that 7-Eleven would be taking their store away that very day.

44. Further, the Asset Protection Interrogators told Dilip and Saroj that 7-Eleven would not give them an opportunity to sell the store.

45. This would result in Dilip and Saroj losing their store, which they had for more than eighteen years, as well as the goodwill associated with their well-run store.

46. When the Patels sat down at the table, Kellison's first words were threatening in nature.

47. Specifically, Kellison stated that one of two things would happen that day: (i) the Patels would give up the store, including their equity, and pay 7-Eleven $100,000; or (ii) 7-Eleven would file a federal lawsuit against them, individually and/or collectively, for $250,000.

48. The Asset Protection Interrogators further "advised" Plaintiffs that should they leave the interrogation room, that the lawsuit would be filed immediately.

49. The interview conducted by the Asset Protection Interrogators lasted nearly eight hours and was conducted using "Third Degree Tactics."

50. "Third Degree Tactics" is a euphemism for the inflicting of pain, physical or mental, to extract confessions or statements.

51. During this extensive interrogation, Kellison stated that the Patels had been fraudulently using the Slurpee coupon – and accused them of "double dipping."

52. The Patels believed Kellison's statement to mean that they were allegedly taking cash for Slurpees that were offset with Slurpee coupons, but was not sharing these profits with 7-Eleven.

53.    After the Patels denied any wrongdoing, Kellison showed them two short video clips accompanied by an electronic journal of the transaction.

54.    However, the video and electronic journal did not match up – i.e. did not show the same transaction.

55.    Despite repeated requests by Dilip – and his son Dev, who had just entered the room – Kellison refused to replay the videos.

56.    In fact, Dilip and Dev asked Kellison, "If the video is so compelling, why do you refuse to show it again?"

57.    Kellison did not answer.

58.    7-Eleven was aware that the Patels were not active in the day-to-day operations of the store—rather, the operations were left to Dev.

59.    As such, Dev was more familiar with the way the Point of Sale ("POS") system operated.

60.    The Asset Protection Interrogators' refusal to replay the video in front of Dev caused doubt in the Patels' minds, because Dev would have been able to point out any and all inconsistencies.

61.    Rather, Dev was only shown a few pages of sales transactions that remained showing on a projection screen in the interrogation room.

62.    At this time, Kellison engaged in "cultural shaming."

63.    Specifically, Kellison stated that by being named as a defendant in a lawsuit, the Patels would be publicly embarrassed, especially in the Indian community.

64.    Using cultural biases, including the accusation of threat within the Indian community, in order to get an admission is unethical for an Interrogator – such as Kellison.

65.    However, Kellison took it one step further.

66.     Specifically, Kellison told Patel that if 7-Eleven filed the threatened civil action in federal court, the Internal Revenue Service ("IRS") would likely hear about it, and that the Patels could face imprisonment.

67.     In furtherance of these tactics, New told that Patels that his mother used to work for the IRS and that the threatened lawsuit, and those like it, have "a way of getting out" to the IRS.

68.     Upon information and belief, New's mother was never employed by the IRS.

69.     The new threats by the Asset Protection Interrogators changed the dynamic of the interrogation – going from a monetary issue to one dealing with imprisonment.

70.     The Patels perceived the Asset Protection Interrogators to mean that if the Patels did not sign over the store, that 7-Eleven would "leak" news of the lawsuit to the IRS, causing possible criminal conviction.

71.     At this time, the Asset Protection Interrogators demanded that Dilip and Saroj sign a purported "settlement agreement," telling the Patels that their continued failure to do so would result in the lawsuit being filed.

72.     At this point, Dilip asked if he could have twenty-four hours to confer with an attorney; however, the Asset Protection Interrogators refused.

73.     Dev then asked if he could take the settlement agreement and federal complaint to his friend, Anthony DiBenedetto, who had just graduated law school, to review both documents.

74.     7-Eleven denied the Patels' request to go to Mr. DiBenedetto's office.

75.     7-Eleven Market Manager Halverson and Patricia P. Hollenbeck, an attorney representing 7-Eleven that was present, told Dilip and Saroj that if they did not sign the settlement agreement and attempted to litigate, 7-Eleven would cut off their store operations from Dallas by withdrawing credit.

76. This would mean that vendors would not deliver any supplies to the store, and 7-Eleven threatened to shut off employee payroll, remove all 7-Eleven fixtures and propriety items, and stop their ability to write Western Union money orders.

77. Scared and frightened, the Patels were still unable to retain counsel that was familiar with franchisees' rights and/or franchise litigation.

78. Saroj, a diabetic, was especially intimidated and became very emotional.

79. Saroj became inconsolable and attempted to leave the premises.

80. In order to end the ordeal, and avoid the threatened litigation and/or retaliation, and to save his wife from a possible diabetic episode, Dilip – individually and on behalf of Saroj Patel, Inc.—was coerced into a signing a purported settlement agreement, purportedly requiring Plaintiffs to give up the stores.

**<u>The Purported Agreement has No Effect and Consequence</u>**

81. Despite having signed the agreement, 7-Eleven's efforts to unlawfully take back the store fail on multiple grounds.

82. First, 7-Eleven failed to get Saroj Patel to sign the agreement, despite her being named on the "Non-Curable Notice of Material Breach and Termination." Attached hereto and incorporated herein as Exhibit E is a true and correct copy of the Non-Curable Notice of Material Breach and Termination.

83. Second, Dilip's signature on behalf of the corporation, Saroj Patel, Inc., was without force and effect.

84. Specifically, as a fifty percent shareholder in Saroj Patel, Inc., Saroj did not authorize Dilip to enter into any agreement on behalf of the corporation. Attached hereto and incorporated herein as Exhibit F is a true and correct copy of Saroj Patel, Inc.'s Formation Documents.

85. Third, in the State of California – a community property state – a spouse cannot divest the property rights of the other spouse without due process of law, or without consent.

86. In the instant matter, Saroj did not consent, either in writing or otherwise, that she would give up her property rights.

87. More specifically, Saroj did not consent to Dilip giving up her rights as a fifty percent shareholder of Saroj Patel, Inc.

**COUNT ONE**

**VIOLATION OF THE CALIFORNIA FRANCHISE RELATIONS ACT**

CAL. BUS. & PROF. CODE §§ 20000, *et. seq.*

88. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth in full.

89. Plaintiffs are franchisees as defined by California Business and Professional Code 20020, 20021 and 20030.

90. Defendant is a franchisor as defined by California Business and Professional Code 20020, 20021 and 20030.

91. Plaintiffs are California franchisees, and have spent hundreds of thousands of dollars on franchise fees, licenses, approvals, and related goods and services in operating their store in accordance with their franchise agreement.

92. Plaintiffs reasonably relied upon the written and oral promises and representations of Defendant, and was induced to spend substantial time, effort and money in an on-going attempt to develop and operate his 7-Eleven franchise, and to comply with Defendant's arduous rules and regulations.

93. Defendant has terminated the franchise by force and coercion without demonstrating the requisite "good cause" and did not allow Plaintiffs to cure any alleged defects.

94.     Defendant has failed to comply with the notice provisions of California Business and Professional Code 20020, 20021 and 20030 in that it failed to afford Plaintiff the time allotted under the Code to cure any alleged deficiencies, if any, and used coercive and "storm trooper" tactics to illegally terminate Plaintiffs' Franchise Agreement.

95.     Defendant's failure to provide proper notice of any alleged fault has created an unreasonable standard of performance in violation of California Business and Professional Code 20020, 20021 and 20030

96.     Rather than provide Plaintiffs the requisite time to cure any alleged defect, Defendant chose to coerce a termination without good cause.

97.     Additionally, Defendant has violated California Business and Professional Code 20020, 20021 and 20030 as more fully described herein. Plaintiff therefore seeks equitable relief, full reimbursement of costs and/or damages for wrongful termination, which will have all/or will irreparably damage Plaintiffs including, but not limited to, irreparable damage to Plaintiffs' business reputation that Plaintiffs have caused within the respective franchise system.

## COUNT TWO
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

98.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth in full.

99.     The covenant of good faith and fair dealing is implied in every contract entered into in the State of California, including franchise agreements. Additionally, a franchisor's affirmative obligations under the California Business and Professional Code 20020, 20021 and 20030 incorporates the inherent contractual obligation that the franchisor act in good faith.

100.    The statutory requirement of "good cause" termination includes components of "good faith").

101.     Defendant, at all relevant times, had the obligation to act in good faith in order to maximize the best of interests of Plaintiff under the Franchise Agreement.

102.     Defendant has breached its implied covenant of good faith and fair dealing by and through numerous acts that have harmed Plaintiffs ability to operate their 7-Eleven franchise, by and through the following conduct:

(a)     Failing to provide Plaintiffs the requisite opportunity to cure any alleged default pursuant to California Business and Professional Code 20020, 20021 and 20030;

103.     As a direct and proximate result of Defendant's repeated breaches of the covenant of good faith and fair dealing, Plaintiff has sustained and continues to sustain substantial hardship and considerable monetary damage. Plaintiff herein seeks a declaration that 7-Eleven has acted in bad faith in connection with its obligations under the Franchise Agreement.

**COUNT THREE**
**FRAUDULENT INDUCEMENT**

104.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth in full.

105.     7-Eleven and its employees and agents made intentional misrepresentations to Plaintiffs to induce Plaintiffs to institute an aggressive couponing campaign. into investing their life savings into a 7-Eleven franchise.

106.     Specifically, 7-Eleven made the following misrepresentations:

(a) Telling Plaintiffs that the institution of an aggressive couponing campaign, which  would make Plaintiffs a leader in couponing and customer promotion, would bring more business to the store and promote goodwill throughout the community;

107.     As a result, Plaintiffs were fraudulently induced into initiating an aggressive coupon acceptance campaign in connection the operation of their 7-Eleven franchised store.

108. As a direct and proximate result of 7-Eleven's fraudulent inducement, Plaintiffs have been and will continue to be damaged.

**COUNT FOUR**
**FALSE IMPRISONMENT**

109. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth in full.

110. 7-Eleven, by and through the actions described herein, intentionally deprived Plaintiffs Saroj and Dilip of their freedom of movement by use of force, threats of force, menace, fraud, deceit and unreasonable duress.

111. Plaintiffs Saroj and Dilip felt compelled to stay in the interrogation room, as described herein, on account of the above-described duress.

112. Plaintiffs Saroj and Dilip did not knowingly consent.

113. Plaintiffs Saroj and Dilip were actually harmed.

114. 7-Eleven's conduct, by and through the referenced conduct, was a substantial factor in causing Plaintiffs Saroj and Dilip's harm.

**COUNT FIVE**
**DECLARATORY JUDGMENT**

115. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs of this Complaint as if set forth in full.

116. The signature of Dilip obtained by Defendants on all settlement agreements and other termination documents were the result of coercion.

117. The signatures of Dilip obtained by Defendants on all settlement agreements and other termination documents were the result of defendant and its attorneys thwarting Plaintiffs from obtaining considered and competent counsel.

118.    The signatures of Dilip obtained by Defendants, purporting to bind the corporate Plaintiff, Saroj Patel, Inc. on all settlement agreements and other termination documents are without proper corporate authorization as the signed corporate documents lacked the fifty percent shareholder approval of Saroj.

**WHEREFORE**, Plaintiffs Dilip Patel, Saroj Patel and Saroj Patel, Inc. demand trial by jury and judgment against Defendants as follows:

(a)    Compensatory and consequential damages for injuries resulting from Defendants' breaches of the California Franchise Relations Act;

(b)    An Order Declaring and Adjudging that the Termination of Plaintiffs' 7-Eleven franchises were made without the requisite "good cause" as required by the California Franchise Relations Act;

(c)    Compensatory and consequential damages for injuries resulting from Defendants' breaches of the covenant of good faith and fair dealing;

(d)    Compensatory and consequential damages for injuries resulting from Defendants' fraudulent inducement;

(e)    Compensatory and consequential damages for injuries resulting from Defendant's false imprisonment of plaintiffs;

(f)    An order declaring and adjudging that all settlement agreements, and other documents signed by Plaintiffs on or about December 5, 2013, which purportedly terminated Plaintiffs' 7-Eleven franchises are void and without any force and effect;

(g)    An order declaring that Defendants shall immediately relinquish all control and possession over Store No. 2171-27635;

(h)    Additional damages, as provided by law;

(i)    Attorneys' fees, costs and disbursements as provided by law or contract; and

(j) Such other and further relief as this Court may deem just and proper.

Dated: March 18, 2014

By: Eric Schindler, Esq. (State Bar No. 141386)
**SCHINDLER LAW GROUP**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Telephone: (949) 483-8700
Facsimile: (949) 464-9714
eric@schindlerlaw.net
Of Counsel:

**MARKS & KLEIN, LLP**
Gerald A. Marks, Esq. (*Pro Hac Vice* Forthcoming)
Evan M. Goldman, Esq. (*Pro Hac Vice* Forthcoming)
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625
jerry@marksklein.com
evan@marksklein.com

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable.

By: Eric Schindler, Esq. (State Bar No. 141386)
**SCHINDLER LAW GROUP**
Counsel for Plaintiff

Dated: March 18, 2014

**VERIFICATION OF DILIP PATEL**

I, Dilip Patel, Plaintiff in this matter, have read the contents of the Verified Complaint and hereby verify, under penalty of perjury, that the allegations set forth therein are true and accurate to the best of my knowledge.

Executed this 17th day of March 2014

Dilip Patel

DILIP PATEL

**VERIFICATION OF SAROJ PATEL**

I, Saroj Patel, Plaintiff in this matter, have read the contents of the Verified Complaint and hereby verify, under penalty of perjury, that the allegations set forth therein are true and accurate to the best of my knowledge.

Executed this 17th day of March 2014

Saroj Patel

SAROJ PATEL

# EXHIBIT A

THANK YOU
Thank You 7-11 for all you do! 2nd gr-Room 8
We ♥ the Petal Family at 7-11
7-11 rocks
Taylor Grace
Thank You
Mr. Gonzalez's Class
Thank You!
THANK YOU FROM MRS. B's Class
JACK LINK'S

# EXHIBIT B

the Phillips family. She has done so much not only in giving the school/Court [illegible] a [illegible] but in being [illegible] [illegible] [illegible] [illegible] [illegible]! [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] but you [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] us. By the Phillips family [illegible] [illegible] being a [illegible]? [illegible] [illegible] [illegible] [illegible] [illegible] not [illegible] [illegible]! [illegible] [illegible] [illegible] help [illegible] [illegible] [illegible] [illegible] [illegible] a huge [illegible] in our [illegible]

[illegible]

[illegible signature]

[illegible]

With much excitement the students entered the 7-11 to get an Slurpee & Mr Patel [illegible] gives the students a pep talk. The students leave with such a positive memory of the experience, he is such a wonderful community member.

Mrs Cam

The Patel Family has been incredibly supportive of our community and worked to be active civic members.

Sheila Lewis

951-255-2600 sheila.m.lewis@gmail.com

The Patel family have been nothing but nice, kind and always so friendly. Good hard working people!

Samia Samaie

(714)356-3189
Samiaandiyad@yahoo.com

The Patel family always supports Magnolia, especially the teachers and students. They provide encouragement, free stuff, rewards, and support!

Cheryl Russell

951-656-4448, cher4sc@yahoo.com

Lauren - 3rd grade

I want to say you are so nice to me every time I come he gives me a surpre or a candy

The Patel Family? generously donated to the Harvest Festival @ Magnolia Elementary? Without their kindness we would have been short on drinks for our event

Amanda Meltzer
3160 Lime St
Riverside, CA 92501

The Pattel Family,

Thank you for your donation to our PTA. We would not have had such a great Harvest Festival and other events if you did not care so much for the people in the community and the school. Thank you so much.

Krista Ferrero

Patel Family,

I wanted to take a moment to say thank you for the years of service you provided to my Children's school.

I know that when the Teachers brought their students to 7-Eleven for Reading awards, your store frequently took up the cost of this Treat. The times my daughter came home telling me with awe how the people from 7-Eleven bought their drinks.

I also know you helped the PTA often. Simply said "We are all grateful for your support and we Love you."

Fabia Sanz

949 310 8409

# EXHIBIT C

# Programs

**Canister Program | The Power Of Change**
7-Eleven's in-store canister fundraising program is a cornerstone of our community outreach programs. Through this program 7-Eleven serves community needs by raising awareness and funds for select ch canisters are displayed on store counters and provide an easy, convenient way for our guests to donate their spare change...and join us in changing lives. A few cents may not seem like much, but when yo approximately 1,000 people a day visit a 7-Eleven® store, the power of change becomes impressive.

**Corporate Giving Program**
Direct charitable cash or product donations or sponsorships are other ways 7-Eleven advances its mission. In general, support is provided at the local level for police, school and youth sports programs and

**Products With a Purpose**
7-Eleven is known for selling products and services guests want to meet their convenience needs. Through the sale of select merchandise, 7-Eleven also raises awareness and funds for national causes impo and communities by donating a portion of the proceeds. National causes include the USO, the American Red Cross, breast cancer awareness organizations and St. Jude Children's Research Hospital.

**Operation Chill®**
A tasty reward for staying cool...that's the Operation Chill® Program. This 7-Eleven community outreach program is designed to reduce crime and enhance relations between police and youth. Operation Cl enforcement officers to "ticket" kids they observe doing good deeds or exhibiting positive behavior. The ticket is actually a coupon good for a free 12-oz. Slurpee® semi-frozen, carbonated beverage at any 7-Eleven store.

Since its inception in 1996, the Operation Chill Program has grown to include several hundred local law enforcement agencies in the United States and Canada each year. More than 10 million coupons have officers on the beat in cities and towns where 7-Eleven does business.

In addition to encouraging positive behaviors like wearing bicycle helmets, doing good deeds, participating in community activities and organizations, picking up trash, deterring crime or observing street crc Operation Chill Program offers opportunities for officers to establish a rapport with kids in a neighborhood.

Though the reasons for being "ticketed" may vary, the end result is the same for every youngster: A free Slurpee drink and a smile for a good deed.

**Coupon Program**
We believe there is nothing more important than recognizing and rewarding the positive behavior of our youth. That's why 7-Eleven provides Slurpee® beverage coupons to local schools or youth program: attendance, effort and achievement. Kids of all ages love Slurpee beverages...so what better way to acknowledge a child's hard work than with a tangible and tasty treat?

In addition to youth incentives, 7-Eleven also recognizes the influence and impact adults have on children, so we also provide coffee and Big Gulp® coupons to school PTA organizations or community youtl acknowledge the efforts parents, teachers and coaches are making to ensure our children have a strong foundation to reach their maximum potential.

**7-Eleven Serves | Community Service**
Our franchisees and employees are involved in the communities where we do business, and we encourage them to get to know and support their neighborhoods. Many are active community leaders and vo local initiatives, such as their neighborhood schools or Little League team, and participate in local 7-Eleven community service days.

**Come of Age Program**
Come of Age is 7-Eleven, Inc.'s public awareness and store-personnel training program that was first developed in 1984 to prohibit the illegal sale of alcoholic beverages. The focus of the original program w sale of alcoholic beverages to minors; to anyone purchasing these products for minors; after the legal sales hours; to anyone intoxicated, and for on-premises consumption. The program was expanded in 1 age-restricted products including tobacco, potential inhalants and lottery tickets. For more information, click here.

Its components include customized Computer-Based Training programs available on-line at all 7-Eleven stores, plus in-store signs that remind store personnel to check the age identification of customers wh an age-restricted product but who look underage, and to alert guests that 7-Eleven "IDs" those under a certain age.

**Police Community Network Centers**
The Police Community Network Centers program (PCNC) offers local law enforcement a place to build and improve relations with the residents in their communities. These satellite offices inside select 7-Ele officers on the beat a convenient location to make phone calls and complete paperwork, and offers residents a less-intimidating way to access police for information and assistance. 7-Eleven now has more 100 cities in 18 states and the District of Columbia.

This site is intended for residents of the US and Canada, excluding Quebec
Copyright © 2012 7-Eleven, Inc. All rights reserved

About Us In The Community Careers Franchising Real Estate Newsroom Contact Us About Us In The Community Careers Franchising Real Estate Newsroom

Newsroom .. 2010 News Releases .. FREEZE!

# News Room

OPERAT
CHILL

## Freeze!

*Local Police Want Good Kids To Chill Out with Free Slurpee® Drink*

The uniformed officer approaches a group of kids, hands them "tickets" and says "You have the right to ... a free Slurpee® drink." It's all part of Operation Chill®, 7-Eleven® stores' popular community program that rewards "good behavior" with a cool treat and helps build positive relationships between local law enforcement agencies and young people.

Police officers can be intimidating to many children and teens. But by distributing free Slurpee beverage coupons to good kids doing good things, local police departments across the U.S. can take the chill off their encounters with youngsters.

Through Operation Chill, law enforcement officers from participating local police and sheriff's departments can "ticket" youngsters caught in random acts of kindness, good deeds or involved in positive community activities with the free beverage coupons. Appropriate "offenses" might include helping another person, wearing a bicycle helmet while riding or skating, deterring crime or participating in a police athletic league. Each coupon can be redeemed for a small-size Slurpee drink at participating 7-Eleven stores.

Since the program's inception in 1995, more than 10 million Operation Chill coupons have been distributed to hundreds of law enforcement agencies across the country in areas where 7-Eleven operates stores. During the upcoming summer months and back-to-school season, 1 million Slurpee coupons will be given to kids in more than 300 cities, towns and counties.

Operation Chill was developed by 7-Eleven, Inc. to reward and encourage good behavior by youngsters during the hot summer months when communities may experience increases in loitering, shoplifting and graffiti. The coupons also can be used to support law enforcement agencies' community relations projects.

"Operation Chill continues to be one of our most popular community projects," said Mike Suppe, 7-Eleven's loss prevention manager for southern California. "Kids love it because they love Slurpee drinks. Police officers love it because it g positive reason for them to approach youngsters and thank them for being good citizens.

"Rewarding a million kids with free Slurpees for doing something right is the right thing to do for a lot of different reasons," Suppe said. "Operation Chill helps build strong relationships in the community and recognizes young people's go

According to Suppe, police departments start contacting 7-Eleven earlier each year to sign up for the annual program. Cities already participating in this year's program include Los Angeles, San Diego, New York, Boston, Orlando, Tampa, Las Vegas and Richmond, Va.

Sgt. Amos Melo, who supervises the New Bedford, Mass., police department's school resource officers, said, "This is an excellent way to provide an incentive and reinforce positive behavior. Our department has 300 officers who interact v police beats, and we received an overwhelming response when we offered to provide them with Operation Chill coupons."

7-Eleven's proprietary Slurpee semi-frozen carbonated beverage has generational appeal with slurpers both young and old. More than a half-million Slurpee drinks are purchased each day during the summer at 7-Eleven stores across the

**About 7 Eleven, Inc.**
7 Eleven, Inc. is the premier name and largest chain in the convenience retailing industry. Based in Dallas, Texas, 7-Eleven operates, franchises or licenses close to 8,200 7-Eleven® stores in North America. Globally, 7-Eleven operates, fr licenses more than 38,000 stores in 16 countries. During 2009, 7-Eleven stores worldwide generated total sales of more than $58.9 billion. 7-Eleven has been honored by a number of companies and organizations recently. Accolades incl Entrepreneur magazine's Franchise 500 list for 2009, #3 in Forbes magazine's Top 20 Franchises to Start, #3 among Top 100 Global Franchises by Franchise Direct, #3 in Store Growth by Convenience Store News, #2 in Franchise Times Companies and #29 among Top 100 Chains in Food Service. In addition, Hispanic Magazine named 7-Eleven in its Hispanic Corporate Top 100 Companies that provide the most opportunities to Hispanics. 7-Eleven recently was selected t publications as a company offering the best career and franchisee opportunities. 7-Eleven is franchising its stores in the U.S., and is expanding through organic growth, acquisitions and its Business Conversion Program. In addition, the c the 2009 Shopper-Centric Marketing Innovation from Symphony IRI and the 2010 Retailer of the Year award from PL Buyer because of the company's private-label brand program. Find out more online at www.7-Eleven.com.

**Contact:**
Margaret Chabris
margaret.chabris@7-11.com

7-Eleven.com | Slurpee.com | Store Locator | Gift Card Balance | Lottery Results | Contact Us
Terms of Use | Privacy Statement
This site is intended for residents of the US and Canada, excluding Quebec
Copyright © 2012 7-Eleven, Inc. All rights reserved

About Us In The Community Careers Franchising Real Estate Newsroom Contact Us About Us In The Community Careers Franchising Real Estate Newsroom

Newsroom .. 2011 News Releases .. 2011 Operation Chill

# News Room

## Local Police 'Ticket' Good Kids with Free Slurpee® Coupons

*All the Cool Kids Are Doing It*

OPERATI
CHILL

Dallas (June 23, 2011) – School's out for summer and has been for awhile, although the season officially starts this week. That means youngsters have the freedom to spend their days at neighborhoods, parks, shopping centers and everywhere else kids hang out.

To foster friendly relationships with local law enforcement and encourage good behavior, 7-Eleven, Inc. is giving 1 million "FREE Slurpee®" coupons to police officers who catch kids doing something good. Operation Chill, as the popular community program is called, has been a summer mainstay of 7-Eleven® stores since 1975. Uniformed police officers can be intimidating to many children and teens. Rewarding "good behavior" with a cool treat helps build positive relationships between local law enforcement agencies and young people.

Through Operation Chill, law enforcement officers from participating local police and sheriff's departments can "ticket" youngsters with the free beverage coupons who are "caught" in random acts of kindness, good deeds or positive community activities. Appropriate "offenses" might include helping another person, wearing a bicycle helmet while riding or skateboarding, deterring crime or participating in a police athletic league. Each coupon can be redeemed for a small Slurpee drink at participating 7-Eleven stores.

"Operation Chill coupons are one of the most effective ways to reward many of our young people," said Office Rob E. Wood of the Bellevue Police Department in Washington state. "We have found that one of the best ways to build good police-citizen relationships in Bellevue is to give these coupons to our police bike team. They go into places like parks, malls and multi-family areas to give out the Slurpee coupons. This is an excellent program and shows 7-Eleven's community-minded support in a very tangible way."

Since the program's inception in 1995, more than 10 million Operation Chill coupons have been distributed to hundreds of law enforcement agencies across the country in areas where 7-Eleven operates stores. During the upcoming sumı back-to-school season, 1 million Slurpee coupons will be distributed to kids in more than 300 cities, towns and counties.

Operation Chill was developed by 7-Eleven to positively reward and encourage good behavior by kids during the hot summer months when communities may experience increases in loitering, shoplifting and graffiti. The coupons also can law enforcement agencies' community relations projects.

"Operation Chill has always been one of our most popular community projects," said Mark Stinde, 7-Eleven's senior asset protection director. "Kids love it because they love Slurpee drinks. Police officers love it because it gives them a rea youngsters in a non-authoritative role and build positive relationships."

According to Stinde, police departments begin contacting 7-Eleven earlier each year to sign up for the annual program. Already participating in this year's program are law enforcement agencies from the greater Los Angeles, San Diego, Dallas, Denver and Las Vegas areas.

7-Eleven's proprietary Slurpee semi-frozen carbonated beverage has generational appeal with slurpers both young and old. More than a half-million Slurpee drinks are purchased each day during the summer at 7-Eleven stores across the

**About 7-Eleven, Inc.**
7-Eleven, Inc. is the premier name and largest chain in the convenience retailing industry. Based in Dallas, Texas, 7-Eleven operates, franchises or licenses more than 8,400 7-Eleven® stores in North America. Globally, there are approxir 7-Eleven stores in 16 countries. During 2010, 7-Eleven stores worldwide generated total sales close to $63 billion. 7-Eleven has been honored by a number of companies and organizations recently. Accolades include: #2 on Forbes maga Top Franchises for the Money; #4 spot on Entrepreneur magazine's Franchise 500 list for 2009 and #3 in Forbes magazine's Top 20 Franchises to Start. Hispanic Magazine named 7-Eleven in its Hispanic Corporate Top 100 Companies thi opportunities to Hispanics. 7-Eleven received the 2010 Retailer of the Year from PL (Private Label) Buyer because of the company's private-label brand initiative. The company is franchising its stores in the U.S., and is expanding through acquisitions and its Business Conversion Program. Find out more online at www.7-Eleven.com.

**Contact:**
Margaret Chabris
margaret.chabris@7-11.com

7-Eleven.com | Slurpee.com | Store Locator | Gift Card Balance | Lottery Results | Contact Us
Terms of Use | Privacy Statement

This site is intended for residents of the US and Canada, excluding Quebec
Copyright © 2012 7-Eleven, Inc. All rights reserved

# EXHIBIT D



News Brief

News Brief sponsored by:

**7-Eleven adds 35 Asset Protection positions - the biggest Asset Protection roll-out of 2013** The evolution of the Asset Protection program at 7-Eleven has taken off since Mark Stinde, VP AP joined the organization a couple of years ago. Driven by analytics, they have been able to show a significant return on their investment to the point where it's justified adding 35 Asset Protection positions this year. This is the leading retailer of the year for Asset protection growth.

CAP
JUST RELEASED
Shopping Center Shrink & Crime Risk Report

# EXHIBIT E



NON-CURABLE NOTICE OF MATERIAL BREACH AND TERMINATION

December 5, 2013

BY PERSONAL DELIVERY AND/OR BY
<u>CERTIFIED MAIL</u>

Saroj Patel, Inc.
Dilip Patel
Saroj D. Patel
5958 Magnolia Avenue
Riverside, CA 92506-1884

Re: <u>7-Eleven Store No. 2171-27635C (the "Store")</u>

Mr. and Mrs. Patel:

1. You, through the entity Saroj Patel, Inc., entered into a Store Franchise Agreement effective on or about March 18, 2013 which superseded a franchise agreement effective on or about November 1, 2004 (the Franchise Agreement"), pursuant to which, among other things, 7-Eleven, Inc. ("7-Eleven") leased (or subleased) to you certain equipment ("Equipment") and real property presently described as 7-Eleven Store No. 2171-27635C located at 5958 Magnolia Avenue, Riverside, California 92506 (the "Premises" or the "Store"). The Store and Equipment are more particularly described in Exhibits A and B to the Franchise Agreement. All terms not separately defined herein shall have the same meanings herein as defined in the Franchise Agreement.

2. In the Franchise Agreement, you covenanted and agreed, among other things, that you would:

   (a) Cause all sales of Inventory to be properly recorded at the time of sale at the retail prices set by you and generally offered by you to customers of the Store;

   (b) Use electronic equipment provided by 7-Eleven to scan the sale of all products capable of being scanned;

   (c) Prepare and furnish to 7-Eleven actual sales data;

   (d) Prepare and furnish to 7-Eleven daily reports of Receipts;

(e) Deposit the Receipts for each Collection Period within twenty-four hours after the end of the Collection Period in the Bank or night depository designated by 7-Eleven, except for cash expended by you from that day's Receipts for Purchases or Operating Expenses paid on that day, which Purchases and/or Operating Expenses were required to be properly reported and accompanied by invoices reflecting payment;

(f) Prepare and furnish to 7-Eleven daily summaries of Purchases;

(g) Furnish to 7-Eleven copies of invoices for Purchases;

(h) Timely submit the Cash Report to 7-Eleven;

(i) Prepare and furnish to 7-Eleven weekly time and wage authorizations for the Store's employees;

(j) Keep 7-Eleven currently advised in writing of all discounts, allowances and/or premiums received in connection with the operation of the Store;

(k) Provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven may implement from time to time;

(l) Pay all sales, payroll and income taxes with regard to the operation of the Store;

(m) Maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store;

(n) Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System; and

(o) Devote your best efforts to the business of the Store and maximization of the Store's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image.

3. You have materially breached the Franchise Agreement and failed substantially to comply with your aforesaid obligations under the Franchise Agreement in the particulars described below. In summary, however, commencing at a time presently unknown, but undoubtedly for at least the last two years, you embarked upon an illicit, and calculated, scheme to siphon cash from the operation of the Store and, in conjunction therewith, understate, in significant

amounts, merchandise sales. In particular, you have operated a business within a business -- in fact, a cash business -- in the Store. In doing so:

(a) You have intentionally failed, over an extended period of time, to report tens of thousands of dollars of merchandise sales at the Store, as demonstrated by point-of-sale analytics and video surveillance of activities at the Store.

- An analysis of the Store's transactions during the period from December 2012 through the present, reflects aberrational and excessive use of various POS register keys and/or functions indicative of fraudulent activity. The POS register keys and/or functions which you misused include coupons; which cannot be explained by happenstance.

- By way of example, during the aforementioned period, the Store ranked first in the Market for promotion discounts.

  (i) A review of the Store's electronic journals reflects excessive ringing of 7-Eleven Store coupons with no other items being scanned or purchased at the same time. For example, during the time period December 13, 2012 through August 29, 2013, the Store ranked **first** in the Market for negative promotions. The Store reported a total of **514 transactions** during this time period where the receipt totaled a negative number due to the entry of a promotional discount. The Market average for the 90 other stores in the Market where a negative promotion was recorded was 18.

  (ii) By way of further illustration, for the last 90 days the Store ranks **first** in the Market for negative promotions. During such time, the Store reported a total of **171 transactions** where the receipt totaled a negative number due to the entry of a promotional discount. The Market average (excluding the Patel, Inc. Store) for the 59 other stores in the Market where a negative promotion was recorded was 5.05. Thus, the Store was **more than 33 times the Market average**.

(b) The aforementioned fraudulent conduct was confirmed by Store video review of multiple transactions on various days randomly chosen in 2013. By way of illustration, such review demonstrated the following representative results:

- April and May 2013:

  (i) In April and May 2013, both Dilip and Saroj are seen recording fraudulent promotion discounts.

- November 11, 2013:

  (i) Between 11:30 and 12:30 Dilip was at the register, alternating between register 1 (closer to the Store entrance) and register 2 (on the interior side of the Store), along with a Store employee. Dilip, standing at register 1, first rings a sale that includes the purchase of a Mango Snapple by a male customer . The male customer leaves the Store. After he leaves Dilip continues to push keys on the register screen. The electronic journal shows that immediately after the Snapple purchase, three small Slurpees were rung up, along with coupons for four free Big Gulps. There was, however, no customer at either register at the time of this transaction nor corresponding Slurpees or Big Gulps purchased.

- November 13, 2013:

  (i) Between 20:47-20:56 an employee of the Store was at the sales counter selling items to customers. After a couple purchases a 20 oz. Sprite and a 20 oz. Dr. Pepper, they leave the Store, and a police officer enters. The officer can be seen looking at items in the aisle, and then he proceeds to the counter where he makes a purchase that does not include a beverage. Following the purchase by the police officer, the officer steps away from the register and exits the Store. After the purchase has been completed and the officer has left, and when no other customers are near the registers, the Store employee punches keys on the touch screen monitor that operates the register. He thereafter opens and closes the register when no customer is at the counter. A review of the electronic journal shows that the Store employee used the "hot key" for a discount on a small coffee, although no coffee was sold.

(c) You have used the cash illicitly siphoned from the operation of the Store for your personal use and benefit or the use and benefit of your family and friends.

4. Among other matters:

(d) Your failure to properly record taxable sales violates your obligations to 7-Eleven and to the State of California in violation of Cal. Rev. & Tax Code §§ 6051 *et seq.*, 6591 *et seq.*, 7152 *et seq.*, 30101 *et seq.*, and 32001 *et seq.*

(e) Your aforesaid conduct constitutes theft pursuant to California Penal Code §§ 484, 487, and 490a, and fraudulently obtaining money, property, or labor pursuant to California Penal Code § 532.

(f) In the performance of your several schemes, you caused to be transmitted to 7-Eleven Cash Reports that were knowingly false and fraudulent. Such transmissions, among other things, constitute communications in interstate commerce made for the purpose of executing your scheme to defraud, and to obtain money or property by means of false or fraudulent representations, all in violation of the wire fraud statute of the United States, 18 U.S.C. § 1343.

(g) Unless you have properly reported all of the cash illicitly siphoned from the operation of the Store to the Federal and State governments, you have intentionally misrepresented and misstated your income, all in violation of State and Federal law.

In dollar terms, over the last two years -- and your schemes undoubtedly have been ongoing for many years prior to such date -- we estimate that the foregoing activities, among other things, have resulted in the diversion of Receipts substantially in excess of $250,000 and caused additional damages to 7-Eleven. 7-Eleven has been deprived of its full contractual share of the Gross Profit on the diverted Receipts.

5. The practices enumerated above represent willful, fraudulent, intentional, unfair, and unlawful activities on your part that constitute material breaches of the Franchise Agreement, and each of them and violate the very core of the contractual relationship between you and 7-Eleven. As a result, **NOTICE IS HEREBY GIVEN TO YOU OF TERMINATION OF THE FRANCHISE AGREEMENT. GIVEN THE NATURE OF YOUR BREACHES, THIS NOTICE OF MATERIAL BREACH AND TERMINATION MAY NOT BE CURED BY YOU.**

6. 7-Eleven's investigation concerning your above-described activities is ongoing. As 7-Eleven's investigation continues, 7-Eleven reserves the right, without limiting its other rights

(including, without limitation, seeking damages), to issue further and additional non-curable notices of Material Breach and/or Notices of Termination based upon willful, intentional, fraudulent conduct, all without prejudice to the validity of this instant Non-Curable Notice of Material Breach and Termination.

7. Upon the Effective Date (defined below) of the termination of the Franchise Agreement, your Service Mark license, your right to use the Trade Secrets and your lease and/or sublease of the Store and Equipment, shall also terminate. You are required to surrender and turn over possession of any and all rights in and to the Premises to 7-Eleven on and at the Effective Date and to transfer to 7-Eleven all of your right, title and interest in and to the Inventory, together with the Proceeds thereof, on and at the Effective Date, in consideration of the cost thereof reflected on the books and records for the franchises, such cost to be credited and paid against, and in reduction of, the amount owed by you to 7-Eleven on the Open Accounts shown on such books and records, with any surplus to be credited to your Open Accounts in accordance with the close out procedures set forth in the Franchise Agreement.

8. The final physical audit of the Inventory will commence immediately upon the Effective Date. At that time you shall forthwith quit and deliver to 7-Eleven possession of the Store, Equipment and Inventory.

9. The Effective Date of the termination of the Franchise Agreement shall be the date this Non-Curable Notice of Material Breach and Termination is delivered to you.

10. No one or more of the following acts, without limitation, by 7-Eleven between now and such Effective Date shall be construed as a consent to or waiver of any act or default on your part, or as a waiver of 7-Eleven's right to terminate the Franchise Agreement, to declare a termination of the respective Lease and/or Sublease, or to take any action to recover possession of the Store, Equipment and Inventory or to sue for damages:

    (h) collecting or accepting the 7-Eleven Charge;

    (i) debiting your Open Account with the 7-Eleven Charge;

    (j) continuing to allow you the use of the Store, Equipment and Inventory, Service Marks, Trade Secrets, or the 7-Eleven System; and

    (k) continuing to otherwise transact business with you or on your behalf, including but not limited to, furnishing you with the various benefits and services provided for in the Franchise Agreement, including paying for your Inventory purchases.

Finally, be advised that the foregoing description of your illicit activities is based upon an investigation conducted by representatives of 7-Eleven.

7-ELEVEN, INC.

Norman Hower
Zone Leader

☐ By certified mail

Date postmarked : ___________

☒ In person to Dilip Patel

Time: 4:03 a.m./p.m.

Date: 12/5/2013

By: Steve Kellison

# EXHIBIT F

Form **2553**
(Rev. September 1997)
Department of the Treasury
Internal Revenue Service

# Election by a Small Business Corporation

(Under section 1362 of the Internal Revenue Code)

▶ For Paperwork Reduction Act Notice, see page 2 of instructions.

▶ See separate instructions.

OMB No. 1545-0146

**Notes:** 1. This election to be an S corporation can be accepted only if all the tests are met under **Who May Elect** on page 1 of the instructions; all signatures in Parts I & III are originals (no photocopies); and the exact name & address of the corporation and other required form information are provided.

2. Do not file **Form 1120S**, U.S. Income Tax Return for an S Corporation, for any tax year before the year the election takes effect.

3. If the corporation was in existence before the effective date of this election, see **Taxes an S Corporation May Owe** on page 1 of the instructions.

## Part I Election Information

Please Type or Print

Name of corporation (see instructions): SAROJ PATEL

**A** Employer identification number:

Number, street, and room or suite no. (If a P.O. box, see instructions.): 5958 MAGNOLIA AVENUE

**B** Date incorporated: MAY 7, 1999

City or town, state, and ZIP code: RIVERSIDE, CA 92506

**C** State of incorporation: CALIFORNIA

**D** Election is to be effective for tax year beginning (month, day, year) ▶

**E** Name and title of officer or legal representative who the IRS may call for more information: GEORGE W. TEATS JR CPA

**F** Telephone number of officer or legal representative: (714) 835-3327

**G** If the corporation changed its name or address after applying for the EIN shown in A above, check this box ▶ ☐

**H** If this election takes effect for the first tax year the corporation exists, enter month, day, and year of the **earliest** of the following: (1) date the corporation first had shareholders, (2) date the corporation first had assets, or (3) date the corporation began doing business ▶ 1-1-00

**I** Selected tax year: Annual return will be filed for tax year ending (month and day) ▶ DEC 31, 1999

If the tax year ends on any date other than December 31, except for an automatic 52-53-week tax year ending with reference to the month of December, you **must** complete Part II on the back. If the date you enter is the ending date of an automatic 52-53-week tax year, write "52-53-week year" to the right of the date. See Temporary Regulations section 1.441-2T(e)(3).

| J Name and address of each shareholder; shareholder's spouse having a community property interest in the corporation's stock; and each tenant in common, joint tenant, and tenant by the entirety. (A husband and wife (and their estates) are counted as one shareholder in determining the number of shareholders without regard to the manner in which the stock is owned.) | K Shareholders' Consent Statement. Under penalties of perjury, we declare that we consent to the election of the above-named corporation to be an S corporation under section 1362(a) and that we have examined this consent statement, including accompanying schedules and statements, and to the best of our knowledge and belief, it is true, correct, and complete. We understand our consent is binding and may not be withdrawn after the corporation has made a valid election. (Shareholders sign and date below.) | | L Stock owned | | M Social security number or employer identification number (see instructions) | N Share-holder's tax year ends (month and day) |
|---|---|---|---|---|---|---|
| | Signature | Date | Number of shares | Dates acquired | | |
| DILIP R. PATEL | | | 50 | 5-7-99 | | 12/31 |
| SAROJ D. PATEL | | | 50 | 5-7-99 | | 12/31 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Under penalties of perjury, I declare that I have examined this election, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

Signature of officer ▶ Dilip R. Patel Title ▶ President Date ▶ 1/1/2000

See Parts II and III on back.

Form **2553** (Rev. 9-97)

KFA

**Exhibit F**